# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARGARET B. AMIDEI, individually and on behalf of all others similarly situated, | Civil Action No: |
| Plaintiff, | |
| v. | |
| AMERICAN INTERNATIONAL GROUP, INC., MAURICE R. GREENBERG, HOWARD I. SMITH, DONALD P. KANAK, MARTIN J. SULLIVAN, RICHARD A. GROSIAK, AXEL I. FREUDMANN, JOHN DOES 1 - 20 (AIG RETIREMENT BOARD), | |
| Defendants. | |

## COMPLAINT FOR VIOLATIONS OF THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, individually and on behalf of all others similarly situated, by her attorneys, alleges the following based upon the investigation of her counsel, except as to allegations specifically pertaining to Plaintiff which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by American International Group, Inc. ("AIG" or the "Company") with the United States Department of Labor and the Securities and Exchange Commission, a civil action filed by the Attorney General of the State of New York, styled, The People of the State of New York, by Eliot Spitzer, Attorney General of the State of New York, v. Marsh & McLennen Companies, Inc. and Marsh Inc., pending in the Supreme Court of the State of New York (the "NY AG Marsh Complaint"), press releases issued by the Company, media reports and public announcements about the Company,

and publicly available trading data relating to the price of AIG's securities.

## I.   NATURE OF THE ACTION

1.      Plaintiff brings this suit as a civil enforcement action under the Employee Retirement Income Security Act ("ERISA") § 502(a)(2), (3), 29 U.S.C. § 1132(a)(2), (3), for relief on behalf of the AIG Incentive Savings Plan (the "Plan"), a 401(k) plan operated and established by AIG as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. AIG is the Plan's "sponsor," within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

2.      Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and a class of all participants and beneficiaries of the Plan, and on behalf of the Plan itself, during the period November 1, 1998 through the present (the "Class Period"). Defendants are entities and persons acting in a fiduciary capacity or who assumed a fiduciary role in relation to the Plan.

3.      On October 14, 2004, the New York State Attorney General's office announced AIG was a participant in a massive insurance steering and bid-rigging scheme in which AIG paid illegal "kickbacks" to insurance brokers to steer their clients to AIG, thus materially and falsely inflating AIG's revenue and income.

4.      In addition, the New York State Attorney General announced that two AIG executives had pleaded guilty to a first-degree felony count of a "scheme to defraud."

5.      As a result of this shocking news, AIG's stock plummeted to $6.80 per share, or 10.15%, from $66.99 per share on October 13, 2004 to $60.19 per share on October 14, 2004.

6.      AIG's stock price continued its decline the next day on October 15, 2004, falling an additional $2.34 per share to $57.85 per share, representing a two-day stock price decline of $9.14 per share or 13.64%.

7.      Plaintiff and the other participants and beneficiaries of the Plan owned AIG stock through the Plan and have suffered substantial losses.

8.      Plaintiff's claims arise from the failure of the Defendants to exercise the required care, skill, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period.

9.      In particular, Plaintiff alleges that Defendants breached their fiduciary duties to the participants of the Plan because they knew or should have known that the Company's securities were no longer a prudent investment, yet they failed to take steps to eliminate or reduce the amount of Company stock in the Plan, and failed to give Plaintiff and the Class complete and accurate information about AIG's massive steering and bid-rigging scheme so they could make informed investment choices under the Plan.

10.     In addition, Plaintiff alleges that AIG and the members of the board of directors of AIG (the "Director Defendants"), who were responsible for the appointment, and, thus, monitoring of the AIG Retirement Board Defendants (defined below), failed to properly monitor the named fiduciaries of the Plan.

11.     As a result of the Defendants' actions, Plaintiff and the Class, which invested in AIG common stock through the Plan, were wrongfully damaged.

12.     Because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by

necessity upon information and belief. At such time that the Plaintiff has the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend her Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support Plaintiff's claims.

## II.   JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.   This Court has personal jurisdiction over Defendants under ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2) because one or more of the Defendants may be found in this district. The Court also has personal jurisdiction over Defendants because the Company's principal executive offices are located in New York, New York. Defendants systematically and continuously have done and continue to do business in this State, and the case arises out of Defendants' acts within this State.

15.   Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plan in this district, some or all of the actionable conduct for which relief is sought occurred in this district, and one or more of the Defendants may be found in this district.

## III.   THE PARTIES

### Plaintiff

16.   Plaintiff Margaret B. Amidei ("Plaintiff") is a resident of Wheaton, Illinois. She was an employee of The Hartford Steam Boiler Inspection and Insurance Company from 1995 through 1998. The Hartford Steam Boiler Inspection and Insurance Company is a wholly-owned

subsidiary of AIG. During the Class Period, AIG stock was purchased or maintained on her

behalf by means of the Plan.

**Defendants**

A.    **AIG**

17.    Defendant AIG is a business entity organized under the laws of the state of

Delaware with its executive offices located at 70 Pine Street, New York, New York.

a.    AIG is a holding company, which through its subsidiaries, is engaged in a

broad range of insurance and insurance-related activities in the United States and abroad. AIG is

the leading U.S.-based international insurance organization and among the largest underwriters

of commercial and industrial insurance in the United States. Its member companies write

property, casualty, marine, life and financial services insurance in approximately 130 countries

and jurisdictions, and are engaged in a range of financial services businesses.

b.    AIG is the sponsor of the Plan within the meaning of ERISA, and itself

exercised important fiduciary duties and responsibilities. AIG, by and through its Board of

Directors, exercised ultimate decision-making authority for the administration and management

of the Plan and Plan assets. In addition, by and through its Board of Directors, AIG was

responsible for appointing and, thus, monitoring Plan fiduciaries. Furthermore because all other

Defendants acted in the course and scope of their employment with AIG in the conduct giving

rise to liability hereunder, and AIG exercised *de facto* control over them, AIG is liable for the

actions of such other Defendants under basic principles of vicarious and respondeat superior

liability. Thus, AIG is a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C.

§ 1002(21), in that it exercises discretionary authority or discretionary control respecting

management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plan.

**B.    Director Defendants**

18.    Upon information and belief, the AIG Board of Directors ("AIG Board" or the "Board") has ultimate oversight over the AIG Retirement Board, and is entrusted with the authority to appoint and monitor the activities of the AIG Retirement Board, as described below. The actions of the AIG Board were on behalf of and attributable to the Company.  As such, the Board is a fiduciary of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21), in that it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plan.

19.    Defendant Maurice R. Greenberg ("Greenberg") was at all time relevant hereto Chairman of the Board and Chief Executive Officer of AIG.  As AIG's Board was the ultimate font of all fiduciary authority and responsibility for the Plan, Greenberg, its Chairman, was clearly a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority  or control with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

20.    Defendant Howard I. Smith ("Smith") was at all time relevant hereto Vice Chairman of the Board, Chief Administrative Officer, and Chief Financial Officer.  As AIG's Board was the ultimate font of all fiduciary authority and responsibility for the Plan, Smith was

clearly a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary

authority or control with respect to: (i) management and administration of the Plan; and/or (ii)

management and disposition of the Plan's assets.

21.     Defendant Donald P. Kanak ("Kanak") was at all time relevant hereto Vice

Chairman of the Board and Co-Chief Operating Officer. As AIG's Board was the ultimate font

of all fiduciary authority and responsibility for the Plan, Kanak was clearly a fiduciary of the Plan

within the meaning of ERISA in that he exercised discretionary authority or control with respect

to: (i) management and administration of the Plan; and/or (ii) management and disposition of the

Plan's assets.

22.     Defendant Martin J. Sullivan ("Sullivan") was at all time relevant hereto Vice

Chairman of the Board and Co-Chief Operating Officer. As AIG's Board was the ultimate font

of all fiduciary authority and responsibility for the Plan, Sullivan was clearly a fiduciary of the

Plan within the meaning of ERISA in that he exercised discretionary authority or control with

respect to: (i) management and administration of the Plan; and/or (ii) management and

disposition of the Plan's assets.

**C.     The AIG Retirement Board Defendants**

23.     The AIG Retirement Board is the Plan Administrator and, upon information and

belief, was responsible for administering and managing the Plan on a day-to-day basis, and

advising AIG and the AIG Board regarding the Plan and Plan assets. Therefore, the AIG

Retirement Board members are fiduciaries of the Plan within the meaning of ERISA in that they

exercised discretionary authority with respect to: (i) management and administration of the Plan;

and/or (ii) management and disposition of the Plan's assets.

24.    Defendant Richard A. Grosiak was at all time relevant hereto Administrator of the Plan and served as a member of the AIG Retirement Board.  Upon information and belief, Mr. Grosiak was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.  Mr. Grosiak signed, as Administrator of the Plan, the Company's annual reports of the Plan on Form 5500, which are filed with the United States Department of Labor.

25.    Defendant Axel I. Freudmann was at all time relevant hereto Senior Vice President of Human Resources.  Upon information and belief, Mr. Freudmann was a member of the AIG Retirement Board and a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.  Mr. Freudmann signed, as employer or plan sponsor, the Company's annual reports of the Plan on Form 5500.

26.    Defendants John Does 1-20 are reserved for additional members of the AIG Retirement Board.  At the present time, certain AIG Retirement Board members are unknown to Plaintiff.  Once their identities are discovered, Plaintiff will amend her Complaint to join them under their true names.

## IV.    CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and a class consisting of all participants or beneficiaries of the Plan and their beneficiaries, excluding the Defendants, for whose accounts the fiduciaries of the Plan made or maintained investments in AIG stock through

the Plan during the Class Period, from November 1, 1998 through the present.  Excluded from

the Class are Defendants, members of the Defendants' immediate families, any officer, director

or partner of any Defendant or any entity in which a Defendant has a controlling interest and the

heirs, successors or assigns of any of the foregoing.

  28.  This action is properly maintainable as a class action because:

    A.  The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members are unknown by Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a

minimum, thousands of members of the Class.  In AIG's Form 5500 Annual Report for the year

ended December 31, 2002, the Company disclosed that 37,181 participants had account balances

at the end of the year.

    B.  Plaintiff's claims are typical of those of the Class because Plaintiff and

members of the Class suffered similar harm and damages as a result of Defendants' systematic

unlawful and wrongful conduct described herein. Absent a class action, members of the Class

may not receive restitution or other appropriate relief, will continue to suffer losses, and these

violations of law will proceed without remedy.

    C.  Plaintiff is a representative party who will fairly and adequately protect the

interests of the other members of the Class and has retained counsel competent and experienced

in class action securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with,

the Class it seeks to represent.

    D.  A class action is superior to other available methods for the fair and

efficient adjudication of the claims asserted herein.  Prosecution of separate actions by members

of the Class would create a risk of inconsistent adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for Defendants.  As the

damages suffered by the individual Class members may be relatively small, the expense and

burden of individual litigation make it virtually impossible for the Class members individually to

redress the wrongs done to them.  The likelihood of individual Class members prosecuting

separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class

members in a similar manner making declaratory and injunctive relief to the Class as a whole

appropriate.

      29.     The questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class.  The questions of law

and fact which are common to Plaintiff and the Class include, among others:

      a.     Whether ERISA applies to the claims at issue;

      b.     Whether Defendants owe and owed fiduciary duties to the members of the
           Class;

      c.     The nature of the fiduciary duties Defendants owe or owed to members of
           the Class;

      d.     Whether Defendants breached their fiduciary duties; and

      e.     The extent of losses sustained by members of the Class and/or the Plan
           and the appropriate measure of relief.

      30.     Plaintiff anticipates no unusual difficulties in the management of this action as a

class action.

## V.   THE PLAN

31.    By information and belief, the AIG Incentive Savings Plan is a defined contribution plan covering eligible employees of the Company.  It is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, it is an "eligible individual account plan" within the meaning of ERISA  §407(d)(3), 29 U.S.C. §1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. §401(k), 26 U.S.C. §401(k).  The Plan is not a party to this action.  Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plan.

32.    AIG is the Sponsor of the plan and the AIG Retirement Board is the Administrator of the Plan.  Its Employer Identification Number is 13-2592361 and the Plan Number is 003.

33.    The amounts of employee and Company contributions were limited by pertinent provisions of the Internal Revenue Code.  Participants directed the investment of their contributions to various investment options in the Plan.

34.    Most of these options were diversified mutual funds.  However, the options also included the AIG Stock Fund.  Upon information and belief, the option to invest in the AIG Stock Fund was discontinued at some time during the class period.  However, AIG Stock Fund investments were maintained under the Plan throughout the Class Period.

35.    The Company matched the participants' contributions, at certain specified percentages, by making contribution to the participants' accounts.

36.    According to the Company's Form 5500 Annual Report of the Plan, as of December 31, 2002, the Company held approximately $947 million of participant assets under the Plan.

## VI.    DEFENDANTS' FIDUCIARY STATUS

37.    **Named Fiduciaries**. ERISA requires every plan to provide for one or more

named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).

38.    **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly

named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries,

i.e., perform fiduciary functions (including a juridical person such as AIG).  ERISA §

3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he

exercises any discretionary authority or discretionary control respecting management of such plan

or exercises any authority or control respecting management or disposition of its assets...or...has

any discretionary authority or discretionary responsibility in the administration of such plan."

During the Class Period, all of the Defendants performed fiduciary functions under this standard,

and thereby also acted as fiduciaries under ERISA, by, among other things, appointing Plan

administrators, overseeing the Plan administrators, and making statements to participants with

respect to the Company, its financial results and business prospects.

### A.    AIG's Fiduciary Status

39.    AIG is the Sponsor of the Plan and is presumptively responsible for all fiduciary

functions.  Instead of delegating fiduciary responsibility for the Plan to an external service

provider, the Company chose to internalize the fiduciary function by designating the AIG

Retirement Board as the Plan administrator, thereby making the members of that committee

named fiduciaries of the Plan.

40.    By choosing to internalize the fiduciary function, AIG has in actuality retained the

fiduciary function because the AIG Retirement Board was simply a Board of AIG; if AIG

"delegated" the fiduciary function to the AIG Board, it delegated that function to itself. The AIG Board was populated by AIG's own employees and possibly its own officers and directors. These people acted solely in the ordinary course and scope of their employment or agency with AIG. They acted for AIG just as any other employee or agent has acted for AIG in carrying out his or her job. Therefore, ordinary principles of vicarious liability and respondeat superior impose on AIG responsibility for their actions.

41.     In addition, the AIG Retirement Board was dominated by AIG.  Not only were AIG Retirement Board members subject to removal at the pleasure of AIG, but because they were Company employees, officers, and/or directors, their careers, financial livelihoods and reputations depended on their ongoing positive relationship with the Company.  As a result, the AIG Retirement Board were influenced or controlled by the Company's tacit or explicit direction with respect to the management, investment, or disposition of plan assets.

42.     AIG's responsibilities also include appointing persons to serve as Plan fiduciaries, and, thus, monitoring such persons.  Therefore, even if an otherwise effective delegation occurred, AIG had a fiduciary duty to monitor the persons it appointed to perform fiduciary functions for it.

43.     With respect to these and all other Plan-related duties and responsibilities, AIG acted through its Board.  Accordingly, AIG is a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

B.     **The Director Defendants' Fiduciary Status**

44.     As alleged above, AIG at all times acted through its Board in carrying out its Plan-related duties and responsibilities. The Board, thus, is the human agent that carries out AIG's ultimate decision-making authority for the Plan and the Plan assets. The Board also is responsible for appointing, and, thus, monitoring the members of the AIG Retirement Board, itself a very important fiduciary duty. Thus, the Board members are fiduciaries of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

45.     Plaintiff does not at this time name all persons who served as members of the Board during the Class Period. Instead, Plaintiff only names the top executive officers of AIG because as such, they had intimate knowledge of the Company's business operations and practices and, therefore, knew or should have known the Company was involved in illegal activities.

46.     The Director Defendants were fiduciaries with responsibility for monitoring their appointees to ensure that they prudently and loyally served the interests of the participants. In addition, as monitoring fiduciaries, the Director Defendants had an affirmative obligation to provide the members of the AIG Retirement Board with relevant information in their possessions that they knew or should have known the members needed in order to prudently and loyally manage the Plan and the Plan assets, including information pertaining to AIG stock.

and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

54.     Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires strict fidelity and loyalty in the execution of the plan's management.

55.     ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

56.     ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring these Defendants to "discharge [their] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of ... providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1),(A),(i), 29 U.S.C. § 1104(a)(1),(A),(i).

47.     Moreover, the Director Defendants failed to disclose AIG was involved in unsustainable illegal business practices and also failed to disclose the fact that investing in AIG stock was an imprudent retirement investment.

48.     If Plaintiff discovers that other Board members knew or should have known about the illegal operations of the Company, Plaintiff will seek leave as necessary to amend the Complaint.

### C.     The AIG Retirement Board Defendants' Fiduciary Status

49.     AIG, at all times relevant hereto, had purportedly delegated to the AIG Retirement Board all powers necessary for the administration of the Plan.

50.     Because the Retirement Board acted only through its members, those members had the same authority and responsibility as the Retirement Board itself.

51.     In this regard, the AIG Retirement Board members authored and signed Plan documents and information required by ERISA.

52.     Thus, the AIG Retirement Board members are fiduciaries of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

### VII.     DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

53.     ERISA is a comprehensive statute covering virtually all aspects of employee benefit plans, including retirement savings plans, such as the Plan.  The goal of ERISA is to protect the interests of Plan participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure

57. Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan assets, include but are not limited to:

a. The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan assets;

b. The duty to evaluate all investment decisions with "an eye single" to the interests of Plan participants and beneficiaries;

c. The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advice;

d. The duty, under appropriate circumstances, to monitor or influence the management of the companies in which the Plan owns stock including, where appropriate, the obligation to bring a derivative action if the fiduciaries were or should have been aware that the officers and directors of the entities whose stock was held by the Plan had breached fiduciary duties owed their shareholders;

e. To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named;

f. The duty to disclose and inform of any material adverse information about

the Company which duty entailed, among other things: (1) a duty not to make materially false and misleading statements or misinform Plan participants; (2) an affirmative duty to inform Plan participants about material adverse factors which were affecting the Company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; (3) a duty to convey complete and accurate information material to the circumstances of plan participants and their beneficiaries; and (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates; and

g.   When a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information which the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment.

58.   ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions. Based on the

information available to Plaintiff, the Defendants' fiduciary responsibilities were at least partially allocated among AIG, the AIG Board, and the AIG Retirement Board.

## VIII.   BACKGROUND AND AIG'S INVOLVEMENT IN ILLEGAL ACTIVITIES

### A.   The "Steering" Scheme in the Insurance Industry

59.     There are basically three types of entities in the insurance market. First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage.  Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

60.     In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer, and (2) it pays the chosen insurance company premiums for the coverage itself.  When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company. Sometimes clients -- particularly large commercial clients -- break out the broker's fee and pay it directly to the broker.

61.     In addition to the first commission payment described above, brokers sometimes receive another kind of payment, a "kick-back" from the insurance company for steering their

clients to the insurer. These kickbacks, called "contingent commissions," come from insurance companies pursuant to arrangements generally known as contingent commission agreements. The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

62.    Insurance brokers improperly "steered" their clients to particular insurance companies in return for high commissions, even though the broker could have obtained a similar and cheaper policy with another insurance company.

63.    Essentially, insurance companies used commission payments as a "kick-back" system because if a broker was willing to steer business to a particular insurance company, that insurance company was willing to pay the broker a very high commission.

64.    Insurance brokers' steering harms their clients in at least two ways. First, these insurance brokers specialize in complex insurance placements where all things are rarely equal, and where subjective judgment calls have to be made among competitors with varying coverages, financial security and price. A client relies on the insurance broker to make these calls strictly based on the client's best interest, without the corrupting influence of incentive payments. Clients who have been steered have not received the service they paid for. Second, insurance carriers pass the cost of contingent commissions directly on to the clients in the form of higher premiums. For, example, in the civil action described below, which was filed by the New York State Attorney General's Office against a major insurance broker in connection with this scheme, it was disclosed that Munich American Risk Partners [another insurance company], maintains a

separate schedule of higher prices for some insurance brokers' clients because of the contingent

commissions it pays. Effectively, the insurance brokers are secretly raising the price of insurance

for its clients and putting at least some of the increase in its own pocket.

### B.    The "Bid-Rigging" Scheme in the Insurance Industry

65.    In an effort to cover up the "steering" and "kick-back" scheme, the broker would

request insurance companies involved in the scheme to quote artificially high bids for a particular

client, with the "low bid" coming from the insurance company paying the kick-back. Therefore,

if the broker is ever questioned or scrutinized for using a particular insurance company, the

broker can simply argue that they had the lowest bid. In addition, usually the client makes the

ultimate selection of which insurance company it will use and that selection is usually based on

the insurance company with the lowest quote. In return for cooperating with the broker and

quoting the artificially high bid, the next time around, the broker would steer that insurance

company clients. This "Bid-Rigging" scheme developed into a prevalent and common practice

in the insurance industry and allowed particular brokers and insurance companies to control the

insurance market in terms of competition and price.

### C.    AIG's Involvement in Insurance Steering and Bid Rigging

66.    Throughout the Class Period, Defendant AIG, the nations leading insurance

company, which is managed by Defendant Greenberg, engaged in various steering and bid

rigging transactions with the nation's leading insurance brokerage firm, Marsh & McLennan

Companies ("Marsh"), which was managed by Defendant Greenberg's son Jeffrey Greenberg, as

chief executive officer. On October 25, 2004, Jeffrey Greenberg resigned from his leadership

position with Marsh as a result of the Attorney General's civil action described below. In

addition, Defendant AIG and Marsh engaged in various bid rigging transactions with ACE, another major insurance company which is managed by its chief executive officer Evan Greenberg, another son of Defendant Greenberg and the younger brother of Marsh's former chief executive officer, Jeffrey Greenberg.

67.   On October 14, 2004,  the Office of New York State Attorney General announced the initiation of a civil action against Marsh, alleging that it steered unsuspecting clients to insurers, including AIG and ACE, with whom it had payoff agreements, and that the firm solicited rigged bids for insurance contracts.  (See the NY AG Marsh Complaint).   The Attorney General's office stated that the actions against the brokerage firm stems from a widening investigation of fraud and anti-competitive practices in the insurance industry.  Major insurance companies, including AIG, are named in the complaint as participants in steering and bid rigging.

68.   In addition, the New York State Attorney General announced that two AIG executives had pleaded guilty to a first-degree felony count of a "scheme to defraud" because they allowed Marsh to control the insurance market and "to protect incumbent insurance carriers when their business was up for renewal."

69.   In particular, the New York Attorney General's complaint stated AIG engaged in systematic bid manipulation. When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote.  If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

70.     In situations where another insurance carrier was the company next up for a client in the bidding scheme, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business. In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes. In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target. For example, in October 2003, an underwriter at AIG described a particular quote that he had provided in an email: "This was not a real opportunity. Incumbent Zurich [another insurance company] did what they needed to do at renewal. We were just there in case they defaulted. Broker . . . said Zurich came in around $750K & wanted us to quote around $900K." Even when AIG could have quoted a premium lower than the target, it rarely did so. Instead, AIG provided a quote consistent with the target premium set by Marsh, thereby throwing the bid. (See the N Y AG Marsh Complaint at ¶46).

71.     The complaint also describes another "Bid-Rigging" transaction in the bidding for the excess casualty insurance business of Fortune Brands, Inc., a holding company engaged in the manufacture and sale of home products, office products, golf products, and distilled spirits and wine. On December 17, 2002, an ACE assistant vice president of underwriting sent a fax to Greg Doherty, a senior vice president in Marsh Global Broking's Excess Casualty division, quoting an annual premium of $990,000 for the policy. Later that day, ACE revised its bid upward to $1,100,000. On the fax cover sheet with the revised bid, ACE's assistant vice president wrote: "Per our conversation attached is revised confirmation. All terms & conditions remain unchanged." An email the next day from the assistant vice president to an ACE vice president of

underwriting explained the revision as follows: "Original quote $990,000 . . . . We were more competitive than AIG in price and terms. MMGB [Marsh] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business. . . ."  (See the NY AG Marsh Complaint at ¶53).

72.    Yet, another example from the complaint that further demonstrates the bid-rigging scheme, is the bidding process for excess casualty insurance for Brambles, USA, a manufacturer of commercial industrial pallets and containers (among other products).  In June of 2003, ACE learned that Brambles was unhappy with its incumbent carrier, AIG.  Despite this, Marsh asked ACE to refrain from submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business.  An ACE vice president of underwriting wrote to the ACE President of Risk and Casualty: "Our rating has a risk at $890,000 and I advised MMGB NY [Marsh] that we could get to $850,000 if needed.  Doherty gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing."  (See the NY AG Marsh Complaint at ¶55).  ACE continued to provide Marsh with inflated quotes into 2004.

73.    The Attorney General also announced that in 2003 alone Marsh "reaped some $800 million in fees from insurers" from its illicit scheme described above and that it is "very possible" that Marsh could face criminal charges.  He went on to state that his office was "misled at the very highest levels of [the] company" and that the "leadership of [Marsh] is not a leadership" that he would talk to or negotiate with.  Specifically, an October 15, 2004 New York Times article stated that the Attorney General suggested that he had come across indications of wrongdoing in "[v]irtually every line of insurance business", including cars, home, and health

insurance.  The article also quoted the Attorney General as promising "numerous criminal and civil cases" resulting from his investigation.

74.     In turn, AIG improperly reaped billions of dollars in revenues from insurance steered its way as a result of its payment of the kickback fees and its involvement in the illicit scheme.

75.     In reaction to these disclosures, the price per share of AIG common stock plummeted $6.80 per share or 10.15% from $66.99 per share on October 13, 2004 to $60.19 per share on October 14, 2004.

76.     AIG's stock price continued its decline the next day on October 15, 2004, falling an additional $2.34 per share to $57.85 per share, representing a two-day stock price decline of $9.14 per share or 13.64%.

## IX.   DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.     Defendants Knowledge of AIG's Stock Risk and Subsequent Communication with Plan Participants and Beneficiaries

77.     Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

78.     Because of the access to this information, the Defendants knew or should have known of the scheme because the Company regularly paid Marsh extraordinary commissions and other insurance companies were not able to compete against AIG for business.

79.     In addition, the Defendants also knew or should have known that the Company's ability to retain its dominance of the insurance market and its ability to keep other insurance companies "out of the competition," was dependant upon its ongoing participation with Marsh, ACE, and others, in the above described scheme.

80.     Therefore, the Director Defendants knew or should have known that AIG derived a substantial amount of revenue and income from unsustainable business practices and therefore AIG's stock was artificially inflated.

81.     Moreover, given the amount of revenue generated from the scheme, and the extensive planning, coordination, and communication necessary in order to orchestrate and perpetuate the scheme, it is inconceivable that the Company's executive officers did not have personal knowledge of the scheme.

82.     Furthermore, Defendant Greenberg because of his close familial relationship with the chief executives of Marsh and ACE, his sons, knew or should have known of the scheme because of the abnormal amount of activity between the companies and the inability of other insurance companies to compete for business.

83.     Not only was AIG's stock inflated by revenue improperly obtained as a result of illegal activity, but, because of AIG's central involvement in the steering and bid-rigging scheme, the Company has been exposed to massive penalties and/or fines.

84.     The Defendants knew or should have known that the Company was exposed to massive penalties and/or fines because of its involvement in illegal activities.

85.     Upon information and belief, the Defendants regularly communicated with employees, including Plan participants and beneficiaries, about AIG's financial performance, future financial and business prospects, and the attractiveness of AIG stock.

86.     Despite the Defendants knowledge of AIG's risky and illegal business practices, during the Class Period, the Company fostered a positive attitude toward AIG as a Plan investment. Management touted strong Company performance and stock benefits. Employees continually heard positive news about AIG's growth, were led to believe that AIG stock was a good investment, and that the Plan was prudently managed.

87.     Moreover, AIG publicly repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were later found to be derived from illegal business practices during the Class Period.

88.     As fiduciaries, the Defendants had a duty to provide participants with complete and accurate information regarding the Plan's investment options, including the AIG Stock Fund. Despite these duties, however, the Defendants failed to provide Plan participants with complete and accurate information regarding AIG stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding investments in the AIG Stock Fund.

89.     Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plan.

90.     AIG employees and Plan participants were led to believe that AIG stock was a prudent investment and that the Plan was managed properly.   These misleading communications regarding the performance of AIG stock and its true value caused Plaintiff and the Class to invest in the AIG Fund and to maintain that investment to their detriment.

91.     Moreover, the Defendants knew or should have known certain basic facts about the characteristics and behavior of Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

a.      Out of loyalty, employees tend to invest in company stock;

b.      Employees tend not to change their investment option allocations in the plan once made; and

c.      Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

92.     Even though the Defendants knew or should have known these facts, and even though they knew of the high concentration of Plan participant funds invested in the AIG Stock Fund, they did nothing to address the problem.

93.      Defendants concealment of material non-public information, as well as their improper influence on Plan participants, caused Plaintiff's and the Class to invest in AIG stock and retain their investment in the stock. The  investment decisions of the Plaintiff and the Class were dependent on the misrepresentations of the Defendants.

**B.     Conflicts of Interest**

94.     The Director Defendants had a strong incentive for the participants of the Plan to invest heavily in AIG stock because their compensation was closely tied to the price of AIG stock

because of various stock options granted to them during the Class Period. Indeed, advising of the risks in investing in the stock would have been detrimental to the Director Defendants. This would have negatively affected the price of AIG stock, thereby decreasing the amount of compensation received by the Director Defendants.

95.     In addition, the AIG Retirement Board members were dominated and/or controlled by AIG and the Director Defendants. Their salaries and bonuses were dependant upon obedience to AIG and the Director Defendants.

96.     These conflicts of interest forced the Defendants to choose between serving their own interests or serving the interests of the Plan participants and beneficiaries. Although ERISA requires that the Defendants serve the participants and beneficiaries with loyalty and prudence, the Defendants failed to do so.

**C.      Causation**

97.     The Plan suffered massive losses because a substantial amount of Plan assets were imprudently allowed to be put at great risk by the Defendants, through investment by the Plan in AIG common stock during the Class Period, and in breach of Defendants' fiduciary duties.

98.     Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in AIG common stock and divesting the Plan from Company stock offered by the Plan when such investment alternatives became imprudent, the Plan would have avoided all of the losses that it suffered through its investment in Company common stock.

### D.   Remedies for Defendants' Breach of Fiduciary Duties

99.   The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock.  As a consequence of the Defendants' breaches, the Plan suffered significant losses.

100.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

101.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

102.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

103.    Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## FIRST CLAIM FOR RELIEF

### For Breach of Fiduciary Duty or Knowing Participation Therein
### (Against All Defendants)

104.    Plaintiff incorporates the foregoing paragraphs herein by reference.

105.    The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plan. Each of the Defendants is a fiduciary or co-fiduciary with respect to the Plan pursuant to the provisions of ERISA.  As co-fiduciaries, each of the Defendants is liable for the other's conduct.

106.    Defendants violated their fiduciary duties of loyalty and prudence by: (1) failing to adequately investigate and monitor the merits of the investments in Company stock; (2) failing to take steps to eliminate or reduce the amount of Company stock in the Plan; and (3) failing to give plaintiffs and the Class accurate information about AIG regarding its business practices so they could make informed investment choices under the Plan.

107.   At all times relevant to the allegations raised herein, each of the Defendants was a co-fiduciary of the others.  Each Defendant knowingly participated in the fiduciary breaches described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA, and/or had knowledge of the breaches of its co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

108.   As a result of Defendants' breach of fiduciary duties, Plaintiff and the Class, as well as the Plan, suffered damages, the exact amount of which will be determined at trial. Defendants are personally liable to Plaintiff and the Class for these losses.

### SECOND CLAIM FOR RELIEF

#### For Violations of ERISA Disclosure Requirements
#### (Against All Defendants)

109.   Plaintiff incorporates the foregoing paragraphs herein by reference.

110.   Defendants failed to advise Plaintiff and the Class that their investment in AIG stock was at substantial risk as a result of the Company's business practices and its exposure to massive penalties and/or fines.  Defendants also failed to provide Plaintiff and the Class with accurate, truthful, or complete information about the Company's operations and illegal generation of revenue.

111.   Unbeknownst to Plaintiff and the Class, but known to Defendants, AIG's undisclosed risk of impaired financial condition was not revealed during the relevant time period. Because of the disparity in knowledge between Defendants, Plaintiff, and the Class, Plaintiff and the Class relied on Defendants to provide them with accurate and complete information about AIG, which was material to the suitability of Company stock as a prudent investment option.

112.    By failing to convey complete and accurate information to Plaintiff and the Class, Defendants violated their affirmative duty to disclose sufficient information to apprise Plaintiff and the Class of the risks associated with investment in Company stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiff and the Class.

113.    As a result of Defendants' failure to disclose and inform, Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial.  Defendants are personally liable to Plaintiff and the Class for these losses.

### THIRD CLAIM FOR RELIEF

**For Failure to Monitor Fiduciaries**
**(Against AIG and the Director Defendants)**

114.    Plaintiff incorporates the foregoing paragraphs herein by reference.

115.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

116.    At all relevant times as alleged above, the scope of the fiduciary duties of AIG and the Director Defendants included the responsibility to appoint, and, thus, monitor the performance of the Retirement Board.

117.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

118.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

119.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

120.    AIG and the Director Defendants breached their fiduciary monitoring duties by, among other things: (a) failing altogether to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees imprudent action; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of AIG's highly risky and inappropriate business and inflated revenue from illegal activities, and the likely impact of such practices on the value of the Plan's investment in AIG stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed decisions with respect to the Plan's assets; and (d)

failing to remove appointees named herein whose performance was inadequate in that they continued to make and maintain huge investments in AIG stock during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

121.   As a result of AIG and the Director Defendants' failure to monitor fiduciaries, Plaintiff and the Class suffered damages, the exact amount of which will be determined at trial. The Director Defendants are personally liable to Plaintiff and the Class for these losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a.   Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

b.   Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

c.   Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder, pursuant to Fed. R. Civ. P. 64 and 65;

d.   Awarding the Plan and/or Plaintiff and members of the Class, restitution, disgorgement and/or other remedial relief;

e.   Allowing a trial by jury to the extent permitted by law;

f.   Awarding the Plan and/or Plaintiff and members of the Class pre-judgment and

post judgment interest, as well as their reasonable attorneys' fees, expert witness

fees, and other costs; and

g.   Awarding such other relief as this Court may deem just and proper.

Dated: New York, New York
       November 30, 2004

Respectfully submitted,

By: _____
Marian P. Rosner
Robert C. Finkel
Michael A. Schwartz
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel. (212) 759.4600

*Attorneys for Plaintiff*